May it please the Court, my name is Daniel Rolfe. I have the privilege of representing the appellants in this case, the Swan View Coalition and the Friends of the Wild Swan. If I may please reserve two minutes for rebuttal. Sure. Key issues in these consolidated cases involve the legality of the environmental baselines employed by the U.S. Fish and Wildlife Service in its three biological opinions at issue here, as well as Swan View's claim that the Forest Service violated the National Forest Management Act by failing to follow the Flathead Forest Plan's 2005 deadline for implementing site-specific road closure decisions already made by the Forest Service. In essence, the federal agencies argue that this Court should reject those claims because the Flathead Forest Plan is meaningless. If you don't mind, if I could just interject with a question that was troubling me. It appeared that there's going to be a re-initiation of consultation in December, or at least there's some indication of that. And so my question is, well, why should we be deciding this Endangered Species Act challenge, at least that portion, if it's going to be moved in a few weeks, essentially? Well, Your Honor, that argument comes from the incidental take statement of the biological opinion in the 2005 biological opinion for overall forest plan implementation. That has not occurred. That re-initiation has not occurred. It may occur in the future. However, Ninth Circuit case law that we cite in our reply brief on the mootness issue has indicated that this Court will not find mootness until it actually takes place. So it's scheduled to occur in December? It is not scheduled, Your Honor, under the terms of the incidental take statement. The Forest Service's shield, if you will, for the additional harm, death or injury to grizzly bears as a result of the high road densities presently on the Flathead National Forest that violate the Forest Plan's road density guidelines, that shield will disappear if the Flathead National Forest, which it will not, does not meet the Flathead, the plan's road density standards by the end of 2009. Now, hopefully, the U.S. Forest Service would re-initiate consultation with the Fish and Wildlife Service if that occurs. Whether the Forest Service will do that or not, we cannot say. And appellees have a heavy burden of showing mootness, and in fact there are a lot of cases where environmental plaintiffs have had to challenge a federal agency's failure to re-initiate consultation. So the federal agencies have not met their heavy burden of demonstrating mootness in this case. Turning in particular to the environmental baseline issue for the biological opinions, the circumstances in this case are nearly identical to those in a case decided by this court in 2002, Native Ecosystems Council v. Dombek, an opinion authored by Judge Nelson of this panel. In that case, the facts were very similar to the facts here. The Forest Service argued that it could avoid complying with the National Environmental Policy Act in its decision to weaken the road density standards of a plan because that would simply perpetuate the status quo. The agency would not be out doing any affirmative action that would cause an adverse impact. However, this court squarely rejected that claim, noting that the status quo indeed would be changed because the Forest Service would no longer have an obligation, an affirmative obligation, to go out and close a number of miles of road. So therefore, this court concluded that, in fact, that would cause a real-world physical impact on the environment. So Dombek was a NEPA case. We're now in the Endangered Species Act land, right? And so I was trying to understand how you survive the SUA, the Supreme Court's decision in SUA, which seems to indicate that you need to have discrete agency actions that the agency is legally required to take in order to include those as part of the baseline. Could you address that? The government makes a number of arguments that A19 is not discrete actions. The seven projects that you list are not discrete actions. There's no timeline. They're contingent on funding. So explain how you overcome the SUA objection. Yes, of course, Your Honor. SUA, of course, is where the U.S. Supreme Court found that sort of vague elements, will-do elements of forest plans were unenforceable because the court was primarily concerned with federal courts getting involved in the day-to-day activities of land managers. The Supreme Court found that there were two necessary requirements to allow plaintiffs to enforce an action under 706.1 of the Administrative Procedure Act. Number one was that there was a discrete action. In this case, we do indeed have discrete actions. The specific road closure decisions that my clients are seeking to enforce involve site-specific decisions to close specific roads that were already made by the U.S. Forest Service. So that is a key distinction in the SUA case. There were no agency decisions, site-specific decisions at issue in SUA. The plaintiffs were just trying to force some general monitoring program, and the court emphasized the general nature of their concerns. Here, however, my clients are attempting to enforce site-specific road closures that were already decided by the Forest Service within a time period, the 2005 deadline, that was also specified by the Forest Service itself in the Flathead Forest Plan. So here we have two discrete agency decisions, or excuse me, discrete agency decisions, site-specific road closures. We also have a specific timeline imposed by the agency itself on itself, the 2005 deadline in the Flathead Forest Plan. Additionally, the incidental take statement in the 1995 biological opinion also provided for incidental take shield until 2005. And so in both of those instances, we're simply seeking to enforce the Forest Service's own decisions by the Forest Service's own guidelines. And so the Supreme Court's concern in SUA that would entangle this court in the day-to-day management decisions by the federal agency simply is not present because the Forest Service itself has made all of the decisions. The only recourse by the federal agencies is to say that forest plans really don't mean anything, that this 2005 deadline that the Forest Service established for itself in the Forest Plan is really essentially meaningless. Decisions by this court refute that idea as well. The Ninth Circuit has consistently found that forest plans are in fact meaningful because they do exactly what the National Forest Management Act suggests they should. Could the Forest Service on those seven projects that you say are discrete, specific, and legally enforceable, in your view, could the Forest Service go forward now and implement those without any further environmental review or any other further steps? They could just go out in the field now and take those steps? Oh, yes, Your Honor, because those site-specific road closure decisions were made in the context of NEPA documentation. So those decisions, most of those road decisions, were actually coupled with other on-the-ground decisions. For example, one was the Big Mountain decision, where the Forest Service had different types of agency actions proposed and analyzed under NEPA. One element of the action was to allow expansion of the Big Mountain ski area. Another element of the action was to close a number of roads in order to get closer to compliance with the road density standards by 2005. Well, the Forest Service went ahead and allowed expansion of the ski area and then said, oh, gee, it turns out we don't have enough money to close the roads, and since there's no deadline that we specified in our NEPA documentation, we'll just not do it. However, if this Court agreed that the Court has the authority to enforce the plan's 2005 deadline, the agency need make no decision. A record of decision was signed. The agency need do no additional NEPA analysis. A full NEPA analysis of both the ski area expansion and the road closures were made. So, again, this dramatically distinguishes these sets of circumstances from the case in SEWA because the agency has already made the decision. It's already imposed the deadline on itself. Well, counsel, assuming that's true, we say, okay, you've got to do it, and they say, sorry, we don't have any money. What happens then? Well, Your Honor, I think that is an issue for the Forest Service. In similar cases, for example, that we cite in our brief involving critical habitat decisions or decisions whether or not to designate critical habitat under the Endangered Species Act, this Court has really not been very favorable toward protestations by agencies that, oh, we just don't have any money to carry out these actions. So where does the money come from then? Well, Your Honor, the money could come. It's not that the Forest Service has no money. The Forest Service would simply have to reprioritize actions that it takes. So, for example, one element of this case that actually plaintiffs prevailed upon below was the Forest Service going through an entire environmental impact statement process to allow additional snowmobile use within the Flathead National Forest in the springtime, which had impacts on grizzly bear habitat. Now, obviously, that was a fairly resource-intensive process going through a whole full-blown EIS, and the agency chose to spend its money going through a full-blown environmental impact statement to allow additional snowmobile use in the springtime rather than putting those funds toward closing roads. And it would simply be this Court saying, before you go forward with new decisions and new agency actions, you simply need to complete the old agency actions that you've already decided upon by the deadline that you've already imposed upon yourself. I'm trying to figure out the environmental concerns here, and you had complaints about the Robert Wedge and Westside projects. Now, I understand that new roads impact grizzly bear habitat, but don't bears also benefit from the restoration of burned forest lands and the prevention of bark beetle outbreaks? Well, Your Honor, actually, my client's primary concern did not involve the salvage activities themselves. I see. My client's primary concern involved the road density decisions involved as part of those activities. So, again, these decisions... And the failure to close roads and the like is... That's right, Your Honor. So these decisions were paired. So the Forest Service decided to do the salvage sales, which my clients didn't necessarily have a disagreement with. But, in addition, the Forest Service decided, as part of that decision, to weaken the Forest Plan's road density standards and make them substantially less protected. Were they standards or were they objectives? They're actually specifically called objectives, Your Honor. Isn't that a big difference? It is not, Your Honor, for two reasons. Number one, the Forest Service itself acknowledges that the Forest Plan's deadline and the Forest Plan's road density standards are, in fact, mandatory, and we cite a number of Forest Service documents that provide exactly that. And number two, the agency shield from Section 9 of the Endangered Species Act, which prohibits harm to grizzly bears, including death or injury to bears, is predicated on compliance. I see you have about a minute and a half left. Thank you, Mr. Roth. Thank you very much, Your Honor. Good morning. Good morning, Your Honors. May it please the Court, Charles Scott on behalf of the United States. I'd like to quickly start with a point addressing Judge Nelson's question about the environmental concerns here, and I'd like to remind the Court that the three actions in these consolidated appeals are going to have the effect of improving grizzly bear habitat security conditions for this grizzly bear population, a population that as of 2005 the best available science indicated was either stable or increasing. The roads are going to be closed under these projects, but it is true that roads will not be closed at a rate sufficient to keep up with the objectives added to the forest plan by Amendment 19. And Judge Silverman, yes, these are objectives, and there is a distinction between standards and objectives. This is pointed out in the Court's case law. It's also in the NIFMA implementing regulations at 36 CFR 219.7. Is that true as of the time the decisions were made, though? Didn't the regulations change on the definition of objectives? The regulations that were in place, I believe, included that definition at the time, but I'll have to check because they have, as Your Honor knows, they have been struck down several times by the Northern District of California. The case law, however, is clear on it, and the forest plan itself does make a clear distinction between objectives and standards. The objectives are that the 19-1968 levels will be attained in 40 BMU subunits that are subject to them by 2005. There is also a standard that says all forest service activities must result in a net gain towards attainment of these objectives. There is no argument on Swan Views Park that the standard, that there be a net gain in habitat security, was not met in any of the 11 specific projects that are mentioned in this case or within the revised implementation schedule. The fact is conditions are improving. The objectives, the plaintiffs make a big deal of the idea that these were some sort of straitjacket. That come hell or high water, the Forest Service was going to bind itself to reach these objectives by 2005. That's not correct. In fact, the decision notice for these objectives specifically said, we acknowledge that it might prove impractical to attain these objectives by 2005. We will consider that a source of information that we will share with the Fish and Wildlife Service, and if that turns out to be the case, we will reinitiate consultation with the Fish and Wildlife Service, either as to the objectives in individual subunits, which was the case for the Robert Wedge and Westside projects, or as a whole, which is the case in the revised implementation schedule. The Fish and Wildlife Service likewise acknowledged that at the time, achieving these objectives by 2005 might prove impractical and might require reinitiation consultation. Right below the sentence in this Forest Plan that the Swan View cites for the use of the term non-discretionary, it says, if you want to modify these objectives, these grizzly objectives designed to protect endangered species, you have to consult with the Fish and Wildlife Service first. That's exactly what was done here. The decision documents that were made show that these are precisely the sort of objectives that the Supreme Court refused to compel attainment of through a 7061 claim in Sioux of E. Norton. Well, what about their argument, the Swan View's argument, that at least with respect to those seven decisions on road closure, they were specific enough that they fall within the discreet and legally committed framework that the Supreme Court set up in Sioux Way? I'd like to make two points on that, Your Honor. First, reviewing the district court documents, I do not believe that that argument was ever squarely presented to the district court. It is mentioned in the reply brief to the district court and in a Rule 59e motion. We have pointed to discreet actions. Look at these projects. However, in order to bring for judicial review of an agency decision to be viable,  Mr. Rolfe referred to the NEPA documentation. There are administrative records for those projects, or they can be created. There are documents in the record on them. Swan View never sought to have those records lodged with the district court, nor did it ever seek to have the decision documents for those seven projects supplemented into the records that were filed. Without those records, we only have one of the seven decision documents. It's to argue that APA review and enforcement under 7061 is possible without those records there flies in the face of the statement of the Supreme Court in Citizens to Preserve Overton Park v. Volpe that says APA review is based on the complete administrative record before the agency. I also looked, since they referred to standing in their reply brief on appeal as to these projects, the standing declarations filed in the district court make no mention of these specific projects, nor any firm intention to visit their areas. So they wouldn't be viable under Supreme Court's decisions in Lujan v. Defenders of Wildlife and earlier this year in Summers v. Earth Island Institute. That's another showing these claims weren't squarely raised. Now, even assuming that these obstacles to review were overcome, these projects don't create any legal requirement that the 1919-1968 objectives be attained, as the district court pointed out. And I'd point you to its decision denying the Rule 59e motion where this is explicitly stated. These projects, as far as we know from the description of their decision documents in the biological assessment and biological opinion, because, again, the records aren't there, didn't have schedules for implementation of their habitat security measures. Those measures were contingent on funding, and even if fully implemented, they wouldn't result in attainment of these objectives. So they didn't create a legal requirement to undertake a discrete action that would attain the objectives. Now, had there been a claim as to the net gain standard in the forest plan that I referred to earlier, do the projects result in a net gain in habitat security towards attainment of the objectives? Well, pages 491 of the excerpts of record in 35685 and 138-39 of the supplemental excerpts of record in that case show that work has been completed on those projects. Not enough, not all of the work, but work has been completed so that the standard of net gain has been met. That's why Swanview isn't arguing the standard is being violated. But there is a crucial distinction, as the Supreme Court pointed out. An objective, a projection of what the agency will do is not enforceable under 706-1. And the decision documents in this case, excuse me, the record of decision, 419, only confirms that. If you look at pages 70-71 of the opinion in SUA, you'll see that Justice Scalia was referring not only to vague objectives, but rather a list of specific deadlines for the attainment of some sort of, I guess action would be one way of putting it. On pages 70-71, he says, he lists, he notes the fact that the forest, the BLM land plan say, we're going to do X within three years, we're going to do Y within two years, we're going to do Z within one year. And he said these kinds of forest plan objectives aren't the sort of thing that a court can enforce through a 706-1 plan. Well, then why, does the government have any incentive to live up to the objectives? There has to be a presumption of good faith on the government's part, Judge Nelson. And yes, if the court were to say, well, we think this kind of objective, something that will have beneficial effects for grizzly bears, is something that you must meet through every project, that would make undertaking a project that improved conditions, but didn't improve them enough, impossible. And again, yes, there is a standard in the forest plan that provides a clear incentive, not an incentive, a statement that your actions will result in a net gain in habitat security, which is the case here. So yes, there is an incentive to reach those objectives. Can you address the argument that, at least with respect to the Robert Wedge and Westside Reservoir Projects, that the cumulative effects analysis was inadequate? Now, when I went through the record, I was looking for like a chapter that said cumulative effects and had an analysis. And instead, there were bits and pieces of things that the government was citing throughout the record. Is that enough? There's catalogs, but not necessarily an analysis, except perhaps the RG5 document. Well, there is the RG5 document, which goes into specific detail about the forest-wide cumulative effects of amending the forest plan standards. What are we doing on a forest-wide basis? The RG5 document, as well as the citations to the EIS that we have in our record, provide exactly the cumulative impacts analysis that Judge Nelson found lacking in Native Ecosystems Council v. Dombeck. There is a clear acknowledgment that the Robert Wedge and Westside Projects are among four or more projects in the Flathead National Forest that do amend the habitat security objectives. The effect of amending those habitat security objectives forest-wide is acknowledged. And I guess I would point your honor to pages 370 of the excerpts of record in 35484, 374 of the Westside Project, 558 for the Robert Wedge Project, as well as the other citations we've included in the brief. As far as should there have been, I think if you look at the pages from the excerpts of record, you will in fact see that these cumulative analyses are in a section entitled cumulative effects analyses. But I'd like to point out that in League of Wilderness Defenders, and more recently in the Ecology Center v. Castaneda case that we cited in the 20HA letter, this court pointed out that under, including following Lands Council v. McNair, the Yvonne Bonk decision, the way that the agency presents its analyses of cumulative impacts is entitled to deference. There is no, I can't remember exactly the language from League of Wilderness Defenders, but it says we're not going to require you to make any showing in any particular way, as long as there is a reasonably thorough discussion. And I think the record sites show the reasonably thorough discussion that was required by those cases. If I may, I'd like to quickly address the mootness issue that you brought up. The Forest Service is currently working on a biological assessment and expects to have it completed within a couple of weeks. And I will inform the court by 20HA letter when that is, in fact, the case. The effect of reinitiating the consultation will then be to trigger issuance of a biological opinion. The regulations provide that that normally occurs within 135 days, although there is the possibility of extending that time period. As far as this court's case law on mootness, yes, decisions such as Judge Nelson's decision in Neighbors of Cutting Mountain v. Alexander says, effective relief is still available if you can point to on-the-ground effects that we might be able to redress. A biological opinion's analyses, I mean, essentially the 2005 BIOP will be replaced by a superseding new final agency action with new analyses. It will be, the burden will then be on the plaintiffs. When would that happen? As I said, typically from initiation of consultation, which is through a biological assessment, the regs provide that it's typically 135 days. Could be longer, though. So, I mean, until it happens, it hasn't happened. Until it happens, it hasn't happened. But since the process, precisely the process that is being asked for, which is a remand to the agency to redo its ESA Section 7 consultation, that process is underway right now. It will formally commence when the biological assessment is issued, which, again, I expect, I've been told will happen in a few weeks. So what's the point of that? Are you telling us that it's moot now, or it's going to be moot if we just dilly-dally with it, or what? I wanted to alert the Court to the fact that it will become moot. And also, if you look at the doctrine of prudential mootness that some other circuits have adopted, and I acknowledge this circuit has not adopted it yet, if there is not a real meaningful opportunity to provide effective relief, and the relief under the APA would be to set aside the biological opinion and remand to the agency to come up with a new biological opinion, that process is already underway, is what I want to inform you of. So if this will be resolved in 135 days? I don't know that it will be certainly 135 days. What would you have us do with this information? That's what I don't understand. I wanted the Court to be aware of this possibility, or that this process is underway, that the relief that is being requested is going to be provided through the agency's actions. That doesn't stop us from deciding the case now? No, Your Honor, it doesn't. One last point, if I may, Your Honors. I'd like to discuss the cumulative impacts analyses, or I'm sorry, the environmental baseline concept. First, Native Ecosystems Council v. Dombek did not involve the ESA baseline issue whatsoever, as Judge Ikuta pointed out. It was a NEPA cumulative effects analyses decision, and what it said was when you take the action of amending the forest plan standards through a site-specific action, that has an impact. That is acknowledged here. The biops here talk about the site-specific amendments that are undertaken in the Robert Wedge and Westside projects, in the Spotted Beetle Resource Management Project, and in the Moose Post Fire Project. So the cumulative effects are discussed as required. What this Court requires of the government in its environmental baseline analyses is, and this is from Native National Wildlife Federation v. National Marine Fisheries Service, the DAMS case, the government has to take an aggregate approach to jeopardy. You look at what is the environmental baseline and what effects are going to be added to it. And Judge Thomas wrote, in taking this aggregate approach, you can't use an artificially elevated environmental baseline. You can understand, setting an artificially elevated environmental baseline undermines the aggregate analysis of jeopardy. If, for example, in the Robert Wedge and Westside projects, we were to say, these are going to have the effect of amending these objectives in five subunits, but hey, the environmental baseline is they're being attained in 40, so that will still leave 35. That's obviously a ridiculous outcome that has no bearing on the reality on the ground. But really, it's exactly what they're asking for. There seems to be a perception on Swanview's part that the jeopardy analysis sets the baseline, the higher the better, as far as they're concerned, in terms of protection of the species, and then looks, are you going to improve or worsen conditions with respect to that? That's incorrect. The analysis, according to the definition of effects of the action in the regs and National Wildlife Federation of the NIMS, is what are the aggregate effects of the existing action and what you're going to add to it. Thank you, Mr. Scott. Thank you. Mr. Roth. Got about a minute and a half left. Thank you, Your Honor. I just want to make three brief points. On the objectives versus standards issue, as we cite in our briefs, in page 36 of the supplemental record in case 35484, the Forest Service itself describes the Forest Plan's road density standards as, quote, not discretionary, recognizing that those are mandatory. And, in fact, if they were not mandatory, there would be no reason for the agency to have to reinitiate Section 7 consultation under the Endangered Species Act if it did not comply with those standards. And so the agencies are taking inconsistent positions, on the one hand, saying, oh, these are just guidelines, they don't really mean anything on the ground. And then, on the other hand, acknowledging that the Endangered Species Act requires them to reinitiate consultation in changing the action in the first place. And the best example that these actions of not meeting or amending these road density objectives cause physical on-the-ground impacts come from the agencies themselves. In the Fish and Wildlife Service's incidental take statements, as well as the Forest Service's biological assessments, for all three of the biological opinions we're talking about at issue here, both agencies found that the Forest Service's failure to meet those road density standards would lead to increased death and injury of grizzly bears. And that recognition simply wasn't followed through in the consultation process itself. Thank you very much. Thank you, Your Honor. Mr. Scott Bank, thank you as well. The case has just argued. It will stand in recess for this session. Thank you.
judges: Nelson D. W., Silverman, Ikuta